**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Crim. No. 19-538 |
| | : | |
| JAMHEAR HOPPER | : | |

| | | |
|---|---|---|
| **Diamond, J.** | **MEMORANDUM** | **October 20, 2020** |

Jahmear Hopper is charged with armed carjacking and related firearms offenses. 18 U.S.C. § 2119; 18 U.S.C. § 924(c)(1); 18 U.S.C. § 922(g)(1). (Doc. No. 1.) Shortly after his arrest by Philadelphia Police, Hopper was identified by the victim during a show-up. (Gov.'s Opp. Mot. at 1-2, Doc. No. 36.) Defendant moves to suppress that identification and all subsequent in-court identifications. (Def.'s Mot. to Supp. at 5, Doc. No. 34.) I will grant Defendant's Motion.

**FINDINGS OF FACT**

On August 31, 2020, I conducted a suppression hearing at which the victim and two Police Officers testified. (Hrg. Tr. at 1-2.) Based on the evidence presented, I make the following findings. Fed. R. Crim. P. 12(d).

At around 9 PM on May 6, 2019, Terrell Boozer was in the front passenger seat of his parked pickup truck when he heard the driver's door open. (Hrg. Tr. at 51-52.) Boozer expected to see his wife, but instead saw a man "lunging into the vehicle." (Id. at 53-54; 55-56; 57.) Saying "hey bro," the man pointed a semi-automatic handgun at Boozer, who heard two "clicks." (Id. at 55-56.) Familiar with firearms, Boozer believed the assailant had caused the clicks when he tried to chamber a round of ammunition or fire the gun, which was so close to Boozer's face that he could look down the barrel. (Id. at 55, 75.) ("[T]he gun [was] pointed to my head. Literally right in between my eyes.") The carjacker—whom Boozer did not know—ordered Boozer to "get the

fuck out." (Id. at 56.)   "Horrified," Boozer quickly complied. (Id. at 56, 76.)  As the assailant sped away, Boozer searched the immediate Southwest Philadelphia area for his wife. (Id.)

Boozer credibly estimates that the entire incident—from the door opening to him jumping from the truck—took two or three seconds. (Id. at 69.)  Boozer testified that it was "dark in the car." (Id. at 54; 74.)  The truck's 'dome' light was not working, leaving only the illumination provided by nearby "orange" streetlights. (Id.)  Looking at his cellphone until the door opened, Boozer did not see the carjacker approach the truck. (Id. at 73-74.)  Throughout, Boozer focused his attention on the gun pointed "a couple of inches" from his face, not on his assailant. (Id. at 56, 57, 75-76.)

Once Boozer confirmed his wife's safety, the two called the Police. (Id. at 56.)  At 9:15 PM that night, Officer Timothy Dollarton, who was patrolling nearby, received a "robbery in progress" radio call and drove to the carjacking scene. (Id. at 13.)  Boozer told Dollarton that the assailant was a Black man, around 5'9 tall, with a thin build, wearing dark clothing and a dark baseball cap. (Id. at 14, 44-45.)  Boozer later told Dollarton that he could not see whether the carjacker was wearing a dark baseball cap or just "had a haircut" that made the "top of his head" appear black. (Id. at 70.)  Boozer was "certain" that his assailant was not wearing a red cap. (Id.)

Dollarton and Boozer drove around the area, hoping that the stolen truck might be nearby; it was not.  Dollarton drove Boozer to 12th District Headquarters and then on to Southwest Detectives Division Headquarters. (Id. at 15-17, 58-59.)  At that time, Boozer realized that he could track the stolen truck by tracking the location of his daughter's phone, which he had left inside the truck. (Id. at 17-18.)  Boozer provided location information to Dollarton, who broadcast it over police radio. (Id. at 17-20.)

Less than two hours after the robbery, Police found the stolen truck in Kensington, miles

from the carjacking. (Id. at 86.) After a brief chase, the truck crashed into a parked car. (Id. at 86-87.) Defendant, who was driving the truck, immediately fled on foot, but was quickly apprehended and returned to the crash scene by Officer Stephen Vivarina. (Id. at 90-94.) While running, the Defendant discarded the red cap he had been wearing. (Id. at 91.) Police also detained the truck's three passengers. (Id. at 90.)

When Dollarton and Boozer learned that the stolen truck had been stopped, the two drove from Southwest Detectives to the crash scene—a trip that took around 20 minutes. (Id. at 20-22, 40.) Dollarton was ordered to take Boozer to the crash scene, "[j]ust to see if he could identity, you know, [if] that was his vehicle and also…to see if those [detained] males, if he recognized any of them….To see if any of the males he recognized from the robbery earlier at his house." (Id. at 22, 25.) No other reason for the procedure was offered by Dollarton or any other Officer. Dollarton explained to Boozer that his truck had been found and that the police had detained all those inside. (Id. at 23.) Boozer testified that Dollarton explained the identification procedure that would take place at the crash scene:

> [Dollarton] said they got -- they retrieved the truck and they have four people, four suspects, and whether I'd ID them. And I told them, it was only one guy that robbed me that I know of. . . . the officer notified me that they -- he had got radioed in that there were four individuals in the truck.

(Id. at 60, 62.)

At the crash scene, Dollarton and a Police Supervisor instructed Boozer as follows:

[He] told me when we get there, he needs me to ID my vehicle, and if I could ID the person that took the vehicle. . . . He said if I could ID the person that took the

3

truck. He basically told me would I recognize the individual if I saw him again. . . . I said yes. Once I get there another officer may ask me some questions about what happened and I need to ID the individual, but there was four individuals in the truck. . . . he told me he wants me to take a look at some -- the guys that they found in the vehicle. And he just -- and the police officer told me if you don't -- just if you don't see the guy who robbed you, it's okay, if you do, let me know, yes or no.

(Id. at 61-64.)

There were at least five police cars and many Officers at the crash scene. (Id. at 77-78.) Defendant and each of the three passengers were brought to Boozer, who sat in Dollarton's vehicle, some 35-40 feet from the men. (Id. at 25-34.) Each "suspect" was illuminated by spotlights, handcuffed from behind, and escorted by one or two police officers, who held the arms of each man. (Id. at 32.) Boozer saw the men separately taken from and returned to different police vehicles. (Id. at 43.) Upon being shown each man, Boozer was asked "do you recognize this person…who was involved in tonight." (Id. at 31.) Boozer said he did not recognize the first two men, but identified the third man (the Defendant, who was not then wearing a hat), saying "yes, that's him." (Id. at 34, 70.) Dollarton testified that Boozer "seemed pretty sure" in making the identification. (Id. at 50.) Boozer did not recognize the fourth man.

Significantly, Boozer said the four men all had "distinctive looks." He said the first two were not African American but Hispanic. (Id. at 66.) ("Q. And these, all four of these individuals, were they all African Americans? A. No. . . . The first two appeared to be Hispanic.") Boozer described the fourth man as African American, with dreadlocks. (Id. at 66, 71-73.) Because Boozer had not described his assailant as Hispanic or as having dreadlocks, Defendant was the only man among the four who could fit even the spare description Boozer had provided (a thin

4

Black man of medium height).  Boozer's sole basis for recognizing Defendant on May 6 was thus the show-up itself.

Boozer was shown the "suspects" between 11:40 PM to midnight—some three hours after the carjacking.  (Id. at 35, 94.)  Boozer then made a formal statement to the Police.  (Id. at 91.) Dollarton did not know if the three other "suspects" were released after show-up.  (Id. at 35.)

Defendant was initially charged in state court with carjacking and related offenses.  (Gov.'s Resp. Mot. ¶ 12.)  His preliminary hearing took place on June 14, 2019, when Boozer again identified Defendant as the carjacker.  (Id.)  Boozer also identified Defendant at the suppression hearing before me.  (Hrg. Tr. at 33.)

## CONCLUSIONS OF LAW

*Method of Identification*

A "show-up" is a procedure by "which a single individual arguably fitting a witness's description [of the criminal] is presented to that witness for identification."  United States v. Brownlee, 454 F.3d 131, 137 (3d Cir.2006).  During a "line-up," the witness views several individuals at the same time, each of whom should generally fit the witness's prior description. See United States v. Wade, 388 U.S. 218, 230-31 (1967).  The May 6 procedure Philadelphia Police employed here was thus something of a hybrid.  It was not a usual show-up: Boozer viewed four men seriatim, only one of whom could fit the description he had previously given.  Nor was this a lineup, because he viewed the "suspects" one at a time, and again because only one fit Boozer's description.  Indeed, as I have found, each of the four had a "distinctive" appearance. (Hrg Tr. at 66.)  Defendant  was thus the only "suspect" not excluded by Boozer's earlier description.  In these circumstances, even though four men were presented to Boozer, I will refer

5

to the identification procedure as a show-up.  See, e.g., United States v. Shavers, 693 F.3d 363, 382 (3d Cir. 2012) (terming it a "show-up" when witnesses simultaneously viewed and identified two suspects held in a police vehicle, where the witnesses had seen three men commit the crime); United States v. Scott, 816 Fed.Appx. 732, 739 (3d Cir. 2020).

Defendant urges that allowing Boozer to identify Defendant at trial would violate due process because the show-up procedure was unnecessarily suggestive, created a substantial risk of misidentification, and tainted all subsequent identifications.  (Doc. No. 46 at 8-11.)  I agree.

*Constitutional Standards*

Eyewitness identifications must pass due process muster.  United States v. Clausen, 328 F.3d 708, 713 (3d Cir.2003) (citing United States v. Mathis, 264 F.3d 321, 330 (3d Cir.2001).  The same constitutional standards apply to the admission of pretrial and trial identifications.  Id.  The defendant must show that an identification violated these standards.  See United States v. Lawrence, 349 F.3d 109, 115 (3d Cir.2003).

Due process prohibits "[a]n identification procedure that is both (1) unnecessarily suggestive and (2) creates a substantial risk of misidentification. . . ."  Brownlee, 454 F.3d at 137 (citing Manson v. Brathwaite, 432 U.S. 98, 107, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977)).  The suppression court must thus determine both whether the procedure was suggestive, and "whether there was some good reason for the failure [by the police] to resort to less suggestive procedures." Id. (internal quotations marks omitted).  Finally, even when the procedure is unnecessarily suggestive, an identification may nonetheless be admissible if, "given the totality of the circumstances," it "possesses sufficient aspects of reliability."  Id. at 139.  To assess reliability, the suppression court must consider:

(1) the opportunity of the witness to view the criminal at the time of the crime;

6

      (2) the witness'[s] degree of attention;
      (3) the accuracy of the witness'[s] prior description of the criminal;
      (4) the level of certainty demonstrated by the witness at the confrontation; and
      (5) the length of time between the crime and confrontation.

Id. (citing Neil v. Biggers, 409 U.S. 188, 199, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972)). The court must "weigh[ ] the corrupting effect of the suggestive identification itself" along with these factors, bearing in mind that flaws in an identification's reliability do not necessarily violate due process, and instead can go merely to weight, not admissibility. Manson, 432 U.S. at 114; Brownlee, 454 F.3d at 140.

*Suggestiveness*

Every show-up is somewhat suggestive because, by conducting the procedure, police intimate that they have caught the criminal. See Brownlee, 454 F.3d at 138 (citing Stovall v. Denno, 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). The show-up procedure employed here was especially suggestive. Before Boozer even arrived at the crash scene, Dollarton told him that he would be viewing the four "suspects" Police found in his truck (which Boozer had been tracking) less than two hours after it was stolen. (Hrg. Tr. at 72-73.) Before the viewings began, Police told Boozer, "if you don't see the guy who robbed you, it's okay, if you do, let me know, yes or no." (Id. at 63-64.) If these remarks were intended to assure Boozer that Police had not determined that at least one "suspect" was the carjacker, they undoubtedly had the opposite effect: a reasonable person would have to conclude that Police believed the carjacker was among the "suspects" they had stopped. See Dennis v. Secretary, Pennsylvania Department of Corrections, 834 F.3d 263, 325-26 (3d Cir. 2016) (McKee, C.J., concurring) (discussing role police statements to witnesses play in increasing risk of misidentification).

During the show-up, each man was handcuffed from behind and escorted by one or two

7

police officers.  Each had just emerged from and would be returned to a marked police vehicle.  The Brownlee Court impugned these very actions—handcuffs, police escorts, removal from a marked police vehicle, and conducting the show-up near a stolen car—as increasing a show-up's suggestiveness.  454 F.3d at 138.  But see United States v. Diaz, 444 Fed. Appx. 551, 555-56 (3d Cir. 2011) (finding that "necessary incidents" of an identification, such as handcuffs, will not "alone" render the procedure unnecessarily suggestive).  Indeed, the Government concedes that the circumstances here were at least "somewhat suggestive."  (Gov.'s Opp. Mot. at 10.)

The Government urges that the May 6 show-up was not unduly suggestive because Defendant "was not the sole subject viewed by the victim, Terrell Boozer." (Gov.'s Opp. Mot. at 8.) I disagree. Presenting the other 'subjects' made the May 6 show-up even more suggestive.  As I have found, Defendant's appearance was different from the other three "suspects," and the only one at all consistent with Boozer's description of the carjacker.  (Hrg. Trs. at 44-45; 71-73; 79.) As Boozer testified, because the first two men were not African American, he was able immediately to eliminate them.  (Id. at 71-72.)  The fourth man had dreadlocks; Boozer knew the carjacker did not.  (Id. at 72.)  Indeed, he thought the assailant "had a haircut."  (Id. at 70.) Although the Police did not purposely select four individuals with different appearances (they selected themselves by their presence in the stolen truck), the effect was nonetheless highly suggestive.  When combined with Dollarton's intimation that the carjacker would be among the four "suspects" in the car Boozer had been tracking, the suggestiveness was especially "corrupting." Manson, 432 U.S. at 114.

Significantly, the May 6 show-up appears to have been unnecessary.  Once again, the results of even a suggestive procedure can be saved from suppression if the Government can show that "there was some good reason for the failure to resort to less suggestive procedures."  United

8

States v. Stevens, 935 F.2d 1380, 1389 (3d Cir. 1991) (internal quotations omitted). If it is "demonstrate[d] that [conducting] a show-up procedure was imperative," then the resulting identification may still be admissible. See Brownlee, 454 F.3d 131, 138 n. 4 (a show-up is warranted where the witness is "in critical condition or otherwise unable to withstand a temporary delay"). The Brownlee Court emphasized that Government invocations of the need to "prevent assailants from fleeing and avoid apprehending the wrong people" do not suffice: "[u]sing a line-up or similar procedure in lieu of the inherently suggestive show-up procedure [] can help increase police confidence that they have apprehended the right person." Id.

As I have found, the Government offered no evidence as to why the show-up Police conducted on May 6 was imperative or even necessary. When asked "what would the purpose be to have Mr. Boozer look at these fellows?", Dollarton responded, "To see if any of the males he recognized from the robbery earlier at his house." Yet, by the time Boozer viewed the suspect, some three hours had elapsed. Compare Diaz, 444 Fed. Appx. 553-54 (a show-up conducted mere minutes after the crime was necessary); United States v. Scott, 420 F.Supp.3d 295, 318-19 (3d Cir. 2019) (there was "good reason" for conducting a show-up "within 15 minutes of the robbery"). The Government offers no reason as to why the Police could not have delayed briefly and carried out a less suggestive photo array or line-up. Boozer was uninjured; he plainly could have 'withstood a temporary delay' before attempting to identify the carjacker.

Relying on inapposite authority, the Government offers only a *hypothetical* reason for the show-up: an immediate procedure would allow the police to release any innocent detainees and resume searching for the actual assailant.—exactly the rationale the Brownlee Court disparaged. (Gov.'s Opp. Mot. at 9-10.) Moreover, as I have discussed, the May 6 procedure was not "immediate." See Diaz, 444 Fed. Appx. 553-54; Scott, 420 F.Supp.3d at 318-19. Finally, the

9

Government presented no evidence that Defendant's three passengers were, in fact, released after the show-up. In these circumstances, even the Government's hypothetical reason for the show-up is feeble.

In sum, I cannot conclude that the show-up was "imperative" or even necessary. Brownlee, 454 F.3d at 138 n. 4.

*Risk of Misidentification*

The Supreme Court has instructed that "reliability is the linchpin in determining the admissibility of identification testimony." Manson, 432 U.S. 98, 114. Accordingly, the suggestiveness of the May 6 show-up notwithstanding, I must consider the five Neil factors in deciding Defendant's Motion. Neil, 409 U.S. at 199.

It is apparent that Boozer's identification is not sufficiently reliable to overcome the suggestiveness of the May 6 show-up. First, Boozer had, at best, a very poor opportunity to "view the criminal at the time of the crime." Neil, 409 U.S. at 199. As I have found, the incident occurred at night and the domelight in Boozer's truck was out, leaving only "orange" streetlight illumination. (Hrg. Tr. at 74.) It was, thus, "dark in the car." (Id.) Moreover, the entire incident took no more than three seconds. (Hrg. Tr. at 74.) See generally Third Circuit Task Force, 2019 Report of the United States Court of Appeals for the Third Circuit Task Force on Eyewitness Identifications, 92 TEMP. L. REV. 1, 86-89 (2019) [hereinafter 'Task Force Report'] (discussing how short "exposure duration" and "low illumination" undermine identification accuracy).

Second, Boozer's "degree of attention" was equally poor. Neil, 409 U.S. at 199. During the carjacking, Boozer was focused on the gun pointed between his eyes, inches from his head. (Hrg. Tr. at 75.) As I have found, "horrified" that someone had just tried to shoot him in the head,

Boozer was not paying close attention to the robber. (Hrg. Tr. at 76.) See generally United States v. Mathis, 264 F.3d 321, 338 (3d Cir. 2001) (discussing how 'weapons focus' impugns the reliability of identifications); Task Force Report at 79-81 ("Highly stressful situations have been demonstrated to interfere with eyewitness memory.").

Boozer's almost exclusive focus on the gun explains why his initial description of the carjacker (the third Neil factor) would have fit innumerable people: "a black male, approximately five nine I believe, thin build, wearing dark clothing and a dark baseball cap." (Hrg. Tr. at 14) Nor did Boozer stand by this description: he testified before me that he was actually *unable to see* whether the carjacker had been wearing a dark baseball cap, or rather, just "had a haircut" that made the "top of his head" appear black. (Id. at 70.) Yet, when the Defendant was arrested three hours later, he was wearing a *red* cap. (Id. at 91, 70.) Once again, Boozer was certain the assailant was not wearing a red cap. Boozer's spare description of the carjacker was less than certain, less than accurate, and less than reliable.

Fourth, Dollarton testified that Boozer "seemed pretty sure" in identifying Defendant "at the confrontation." Hrg. Tr. at 50; Neil, 409 U.S. at 199. This modest degree of certainty weighs in favor of reliability to an extent. See United States v. Scott, 816 Fed. Appx. 732, 739 (3d Cir. 2020). See generally Task Force Report at 54-55 ("Without the existence of pristine conditions [in the initial identification process], a witness's confidence is less indicative of reliability because confidence can be artificially inflated by suggestive procedures.")

Finally, the passage of some three hours between the carjacking and the show-up identification weighs in favor of reliability. (Hrg. Tr. at 35.) See, e.g., United States v. Lewis, 719 Fed. Appx. 210, 216-17 (4th Cir. 2018) (a four hour gap "does not suggest unreliability"); McFowler v. Jaimet, 349 F.3d 436, 450 (7th Cir. 2003) ("The fact that the lineup was conducted

11

within six hours of the shooting weighs rather strongly in favor of reliability."); Holemen v. Ryan, 2013 WL 3716603 *1, *26 (D. Ariz. July 15, 2013) (a gap of "less than three hours…was soon enough to point to the reliability of [the] identification").

Considering all these factors, I find there is a substantial risk that Boozer misidentified Defendant at the May 6 show-up. The first three factors are dispositive here. Boozer had only a poor and exceedingly brief opportunity to look at the carjacker. The incident took only three seconds, at night, in dim light. This is underscored both by Boozer's cursory description of the attacker and by Boozer's mistaken insistence that "either [the assailant] had a haircut or it was just a black cap like to the top of his head was black." (Hrg. Tr. at 70.) Understandably, Boozer's attention was focused on the gun inches from his head, not on the man pointing it.

Even though Boozer "seemed pretty sure" in identifying Defendant only three hours after the attack, this does not outweigh the strong doubts created by the first three Neil factors. (Hrg. Tr. at 50.) Accordingly, I am compelled to exclude Boozer's May 6 identification of Defendant.

I am further compelled to exclude Boozer's identifications made at the preliminary and suppression hearings. Once a witness's out-of-court identification is suppressed, the admissibility of that witness's later, in-court identification turns on: (1) his "independent recollection of [his] initial encounter with the assailant," and (2) whether that recollection was "uninfluenced by the pretrial identification[]." See United States v. Crews, 445 U.S. 463, 473 (1980); United States v. Antoine, 603 Fed. Appx. 80, 82-83 (3d Cir. 2015) (citing Crews to determine admissibility of an in-court identification that was challenged on due process grounds). Whether a witness has an independent recollection is governed by the Neil factors. See Antoine, 603 Fed. Appx. at 82-83. Because an independent recollection exists (or does not exist) as of the first identification attempt, the Neil analysis need be conducted only once. See id. (finding a later, in-court identification to

be reliable "[f]or the same [Neil] reasons" as the earlier, out-of-court identification). Further, a suggestive pretrial identification procedure can taint a witness's independent recollection of the perpetrator. See Wade, 388 U.S. at 229 ("[I]t is a matter of common experience that, once a witness has picked out the accused at the line-up, he is not likely to go back on his word later on . . . .") (citation omitted); Young v. Conway, 698 F.3d 69, 81 (2d Cir. 2012) ("[W]here . . . a victim identifies the defendant during an [unconstitutional] identification procedure prior to her in-court identification, her memory can be tainted by the "mugshot commitment effect": having identified that person as the perpetrator, she becomes attached to her prior identification."); Task Force Report at 60-61, 61 n. 316 (discussing the problem of "commitment effect": witnesses usually stick with an identification, regardless of the attendant circumstances).

I have already found that the Neil factors preclude admission of the May 6 show-up. The same reasoning bars admission of Boozer's pretrial and suppression hearing identifications: it demonstrates that Boozer had no recollection of Defendant *independent of the show-up* upon which to base his identification. As I have found, Boozer did not know his assailant; it was the show-up itself that caused Boozer to identify Defendant on May 6, not any independent recollection.

In sum, because Boozer has no untainted, independent recollection of the carjacker on which he could base any post-show-up identifications, his preliminary and suppression hearing identifications, as well as any identification at trial, must be suppressed.

## CONCLUSION

For these reasons, I will grant Defendant's Motion to Suppress. Mr. Boozer may not identify Defendant at trial, nor may the Government introduce into evidence any of Mr. Boozer's prior identifications of Defendant.

An appropriate Order follows.

*/s/ Paul S. Diamond*
_____

October 20, 2020                                                                                  Paul S. Diamond, J.